# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Mark Shane Bishop and Jessica
Lynn Leasure,

|  |  |  |
|---|---|---|
| | Plaintiffs, | Civ. No. 11-1393 (RHK/JJK) |

**MEMORANDUM OPINION
AND ORDER**

v.

Deputy Dale Glazier, *et al.*,

                                       Defendants.

Zorislav R. Leyderman, Law Office of Zorislav R. Leyderman, Minneapolis, Minnesota, for Plaintiff Mark Shane Bishop.

Leonard J. Schweich, Jardine, Logan & O'Brien, P.L.L.P., Lake Elmo, Minnesota, for Defendants.

## INTRODUCTION

This case arises out of the alleged use of excessive force against Plaintiff Mark Shane Bishop by Defendant Dale Glazier, a deputy with the Freeborn County, Minnesota Sheriff's Office. Bishop alleges that Glazier's conduct violated his constitutional rights and Minnesota law. Presently before the Court is Glazier's Motion for Summary Judgment. For the reasons that follow, the Court will grant the Motion as to Bishop's constitutional claim and decline to exercise supplemental jurisdiction over his remaining claims.

## BACKGROUND

Around 1:00 a.m. on December 12, 2010, Bishop was driving in Freeborn County, near the City of Albert Lea, on a trip from Michigan to Oklahoma; also in his car were his fiancée (Jessica Leasure) and their young daughter.  Heavy snow had set in, making driving conditions difficult.  Bishop decided to stop at a hotel for the evening until the weather cleared.  According to a map on his cellular phone, the nearest hotel was a Comfort Inn approximately one mile away.  He exited the highway and proceeded westbound on Freeborn County Road 46, in the hotel's direction.  As he drove down that road, the car hit a snow drift, slid across the roadway, and became stuck in a snow bank on the opposite edge, facing west in the eastbound lane.

Bishop tried unsuccessfully to free the car.  He eventually called the Comfort Inn to see whether anyone there could assist; the desk clerk suggested that he call 911, and he did so.  The 911 dispatcher advised that she would send a Freeborn County deputy to help, and Glazier later arrived in a four-wheel-drive SUV.  The two briefly discussed the situation, and Bishop then re-entered his car while Glazier shoveled snow from around its front wheels.  After he finished, Glazier pushed the vehicle backward and instructed Bishop to give the car gas and turn to the right, toward the road surface.  Bishop, however, steered the car straight – directly back into the snow bank.  This process repeated itself several times, with Glazier shoveling out the front wheels and pushing the

car backward, and Bishop then driving the car forward into the snow bank rather than to the right, as Glazier had instructed.[1]

Exasperated, Glazier told Bishop to shovel out the front wheels himself, and he returned to his vehicle to warm up. Bishop complied, but his efforts proved fruitless. Around 2:20 a.m., Glazier radioed for assistance from the City of Albert Lea police department. Two officers in an SUV arrived a short time later, carrying a "tow strap" to pull Bishop's vehicle out of the snow bank. Glazier retrieved the strap, hooked one end to his vehicle, and handed the other end to Bishop to attach to his car.[2] Bishop crawled under the car but could not figure out where to attach the strap. He looked in the owner's manual but found no answer, so he called a tow-truck company and was advised that the car's tow hooks likely were located somewhere near its front wheels. Bishop then crawled under his vehicle a second time, to no avail. Ultimately he gave up, laid down the tow strap in the snow, and returned to his car. Glazier then approached and opened the driver's side door to speak with him. It is at this point that the alleged assault occurred – and it is also the point at which the parties' stories diverge.

It is undisputed that both Bishop and Glazier had become frustrated with the situation. Bishop testified in his deposition that the mood in his car was "pretty stressful" when he first exited the highway and that he and Leasure were "upset and stressed out" by the snow and, later, becoming stuck. (Bishop Dep. at 84-86, 93.) Glazier testified that

---

[1] Bishop does not appear to dispute that he repeatedly drove his car into the snow bank. It is unclear why he did so.

[2] Glazier testified in his deposition that he does not connect tow straps to other vehicles for "liability reasons."

he was frustrated with Bishop's "feeble attempt" to free his car and his failure to follow directions.  (Glazier Dep. at 98-99; <u>see also</u> Doc. No. 32-1.)

Yet, Bishop contends that Glazier was rude, demeaning, and belligerent during the entire encounter, including yelling and swearing at him, which Glazier denies.  He further asserts that the yelling continued when Glazier opened the car door after he had failed to attach the tow strap.  Because he did not like the way Glazier was treating him, Bishop asked to "go talk to" the Albert Lea officers; Glazier said "no, no, you're not going to go talk to those officers."  (Bishop Dep. at 99-100.)[3]  Nevertheless, after Glazier stepped back from the door, Bishop raised his hands in the air and stepped out of the car, stating, "I'm going to get another officer, I'd like another officer, please."  (Bishop Dep. at 109-12; <u>accord</u> Glazier Dep. at 81-82.)

According to Glazier, he grabbed Bishop's left shoulder with his right hand and "pushed him back down in the car" and told him "to remain in the car."  (Glazier Dep. at 82-84.)  Bishop, however, claims far more – he testified in his deposition (and alleges in this lawsuit) that Glazier grabbed him by the throat, shoved him against the side of the car, and "choked" him for "[r]oughly 45 seconds to a minute."  (Bishop Dep. at 112-19.) He further testified that he "couldn't breathe" and "couldn't talk" as he was being

---

[3] Glazier testified that he refused Bishop's request because visibility was very poor and cars were passing by on County Road 46, and he did not want Bishop to "get lost or get hit by something else."  (Glazier Dep. at 84-85.)  He also testified that Bishop had become "very hostile," and for his own safety, he did not want Bishop out of the car, lest he "com[e] up behind me and strik[e] me or whatever."  (<u>Id.</u> at 85.)  Because Bishop denies acting in a hostile manner, the Court disregards this portion of Glazier's testimony, which does not alter its analysis in any event.

choked.  (Id. at 119.)  He claims that Glazier eventually "shoved" him back into the car and told him to "shut the fuck up and sit the fuck down."  (Id. at 123.)[4]

At this point, Bishop again called 911.  The transcript of that call provides:

Dispatch:  Nine one one emergency

Bishop:  Hi yes I was just assaulted by one of your police officers and he refuses to get me another police officer for help

Dispatch:  Where are you at

Bishop:  I'm the guy that was in the ditch I'm on ah hold on . . . ah . . . I was the guy in the ditch on county highway forty 46 . . . I went to get out

Dispatch:  Who assaulted you

Bishop:  I I'm not sure the officer's name . . . he ah he was the first officer on the scene . . . he assaulted me when I got out of my vehicle to get another officer [because] this one is being belligerent with me I haven't been . . . belligerent at all

Dispatch:  How did he assault you

Bishop:  He grabbed me by the throat and threw me up against my car and told me to get back in my vehicle while I was calling out for another officer . . . I made no verbal assaults towards him no aggressive tone nothing nothing

Dispatch:  Okay where are you at now

Bishop:  I'm still in the ditch . . . this officer is being very rude and won't let me out of my vehicle to get another officer which is right down the road I can see his car . . . when I attempted to get out of my vehicle to and ask him if I could have another officer first he refused and told me to shut my fucking mouth . . . so then I went to get out of my vehicle and I started screaming for another officer and said sir can I get another officer please very loudly he grabbed me by the throat and threw me up against my vehicle in front of my fiancée and my daughter . . . and then he pushed me

---

[4] Although Glazier was not expressly asked in his deposition whether he denies choking Bishop, it is clear from his deposition testimony and the parties' briefs that he does.

> back in my car and told me to shut the fuck up . . . can you please get
> someone one of the other officers right in front I can't get out of my vehicle
> as this one is trying to assault me anytime I try . . .

(Doc. No. 32-1.)  Notably, the transcript makes no mention of Bishop being "choked" for

nearly a minute or being unable to breathe or speak during the so-called "choking."

Regardless, a tow truck eventually arrived and pulled Bishop's car from the snow

bank; he drove to the hotel and later completed the drive to Oklahoma.  On December 29,

2010, he filed a complaint with the Freeborn County Sheriff's Office.  In connection with

that complaint, he submitted a typewritten statement prepared the day after the incident,

in which he wrote that as he exited his car he

> was going to get the other officer, [and Glazier] immediately lunged at me
> and grabbed me by the throat with one hand and my jacket with the other,
> [and] slammed me into the car door rimway. . . . [H]e started to push
> pressure against my body and screaming out 'No you['re] going to sit the
> fuck down and shut the fuck up.'  I kept telling him I want another officer,
> still a calm tone being over run by his screams, [and] [h]e went to push me
> down into my seat with great force, shoving me into my driver's seat.

(Doc. No. 28-1 at 16; see also Bishop Dep. at 134.)  This statement, like the 911 call,

omits any reference to being "choked" for approximately one minute or being unable to

breathe.[5]  Leasure, too, prepared a typewritten statement providing that Glazier had

"lunged at [Bishop,] slamming him up against the car with his hand around his neck and

forced him back in[to] the car," nowhere mentioning a lengthy "choking."  (Doc. No. 28-

1 at 19.)

---

[5] Moreover, while Bishop now contends that he could not speak due to Glazier's conduct, in his
typewritten statement he claimed that he "kept telling [Glazier] I want another officer" – i.e.,
continued speaking – despite the purported "choking."

In addition, Bishop spoke with an investigator from the Freeborn County Sheriff's Office, who recorded their conversation.  Although Bishop again complained that Glazier had "grabbed me by the throat," the recording contains no allegation that he had been "choked" for nearly a minute.  (See Doc. No. 34-1.)

After the Sheriff's Office declined to take action in response to this complaint, Bishop and Leasure commenced the instant action.  Their original Complaint asserted claims against Glazier, the Albert Lea officers, and Freeborn County under the Fourth Amendment to the United States Constitution and Minnesota law.  On November 3, 2011, they filed an Amended Complaint (Doc. No. 18) dropping their claims against the Albert Lea officers, and by stipulation (Doc. No. 24) they later agreed to (i) dismiss all claims brought by Leasure and (ii) dismiss certain other claims in the Amended Complaint.  Bishop's remaining claims are against (i) Glazier, for excessive force under the Fourth Amendment to the United States Constitution (Count I);[6] and (ii) Glazier and Freeborn County, for assault (Count III), battery (Count IV), and false imprisonment

---

[6] Count I could be read to allege two separate Fourth Amendment violations:  (1) excessive force and (2) unlawful arrest, i.e., arrest without probable cause.  (See Am. Compl. ¶ 44 (asserting that Glazier violated Bishop's right to "remain free from unreasonable seizures and use of excessive force").)  In response to Glazier's Motion, however, Bishop has nowhere argued that Count I alleges more than excessive force.  The Court follows his lead and assumes that excessive force is the only way in which Glazier purportedly violated the Fourth Amendment.  (See also Mem. in Opp'n at 17 (acknowledging that "Bishop was not under arrest" during the incident).)  Moreover, although the Amended Complaint alleges that the Glazier's conduct violated the Fourth and Fourteenth Amendments, this is but two different ways of stating the same claim, since the Fourth Amendment is made applicable to state actors through the Fourteenth Amendment's Due Process clause.  See, e.g., Mapp v. Ohio, 367 U.S. 643, 655 (1961).  Hence, claims of excessive force "should be analyzed under the Fourth Amendment," Graham v. Connor, 490 U.S. 386, 395 (1989), and Bishop does not contend otherwise in his brief.

(Count VIII) under Minnesota law.[7]  With discovery complete, Glazier now moves for

summary judgment based on, *inter alia*, qualified immunity.[8]  The Motion has been fully

briefed, the Court held a hearing on June 7, 2012, and the Motion is now ripe for

disposition.

## ANALYSIS

### I.      The standard of review and the relevant facts

Summary judgment is proper if there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Generally, the Court must view

the evidence, and the inferences that may reasonably be drawn from it, in the light most

favorable to the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255

(1986); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  This

typically means "adopting . . . the plaintiff's version of the facts."  Scott v. Harris, 550

U.S. 372, 378 (2007).

Yet, because qualified immunity "is an immunity from suit rather than a mere

defense to liability [and] is effectively lost if a case is erroneously permitted to go to

---

[7] At oral argument, defense counsel asserted that all claims against Freeborn County had been dismissed pursuant to the parties' Stipulation.  The text of the Stipulation belies that assertion, however.  (See Doc. No. 24.)

[8] Although the Motion (Doc. No. 26) indicates it is brought on behalf of Glazier and Freeborn County, the Memoranda in support suggest it is brought by Glazier alone.  (See Def. Mem. at 28 ("Based on the foregoing, *Defendant Deputy Glazier* respectfully requests that Plaintiff's case . . . be dismissed with prejudice.") (emphasis added); Reply Mem. at 7 (same).)  This is apparently because, as noted above, defense counsel (erroneously) believed Freeborn County was dismissed from this case by the parties' Stipulation.  Regardless, for the reasons that follow, the Court declines to exercise supplemental jurisdiction over Bishop's state-law claims, which are the only claims implicating Freeborn County.

trial," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), a "qualified immunity case is

unique," Katosang v. Wasson-Hunt, 392 F. App'x 511, 513 (8th Cir. 2011) (*per curiam*).

When a defendant asserts such a defense, "the court should [not] deny summary

judgment any time a material issue of fact remains on the [constitutional] claim [because

to do so] could undermine the goal of qualified immunity." Brockinton v. City of

Sherwood, Ark., 503 F.3d 667, 671 (8th Cir. 2007) (first alteration added). Rather, the

Court must "take a careful look at the record" and determine "which facts are genuinely

disputed, and then view those facts in a light most favorable to the non-moving party *as

long as those facts are not so blatantly contradicted by the record . . . that no reasonable

jury could believe [them]*." O'Neil v. City of Iowa City, Iowa, 496 F.3d 915, 917 (8th

Cir. 2007) (emphasis added); accord, e.g., Scott, 550 U.S. at 380 ("[F]acts must be

viewed in the light most favorable to the nonmoving party only if there is a 'genuine'

dispute as to those facts."; "When opposing parties tell two different stories, one of which

is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment."); LaCross v. City of Duluth, Civ. No. 10-3922, 2012 WL 1694611, at *8-9

(D. Minn. May 14, 2012) (Ericksen, J.). In other words, a plaintiff may not merely point

to "unsupported self-serving allegations, but must substantiate his allegations with

sufficient probative evidence that would permit a finding in his favor without resort to

speculation, conjecture, or fantasy." Reed v. City of St. Charles, Mo., 561 F.3d 788, 790-

91 (8th Cir. 2009); accord, e.g., Cooper v. Martin, 634 F.3d 477, 480-81 (8th Cir. 2011).

Here, besides his own self-serving testimony, nothing in the record supports Bishop's allegation that Glazier choked him for 45 to 60 seconds.  Glazier denies that such conduct occurred, and Bishop's allegation is at odds with the remainder of the record, including a 911 recording made immediately after the alleged assault, a document he drafted shortly after the incident, a similar document drafted by his fiancée, and the statement he made to a Sheriff's Office investigator, all of which omit any reference to Glazier choking him.  While perhaps it might be understandable that Bishop would fail to use the word "choke" in the 911 call – in the "heat of the moment" – there is simply no obvious reason for him to omit it in the lengthy typewritten statement he later provided or in his conversation with the investigator.  In the Court's view, a reasonable person in the same circumstances would have mentioned the alleged conduct, assuming it had occurred, when making these complaints.  Moreover, there is no evidence Bishop received any medical treatment following the incident or suffered any significant injuries despite claiming he was "choked" and "unable to breathe" for nearly a minute.

Given the state of the record, the Court concludes that no reasonable jury could credit Bishop's assertion that Glazier choked him for 45 to 60 seconds.  See Jenkins v. Anderson, 447 U.S. 231, 238-39 (1980) (testimony about a previously undisclosed fact is undermined when "that fact naturally would have been asserted" earlier).  Accordingly, and notwithstanding the allegations in the Amended Complaint, the Court accepts as true only Bishop's contention that Glazier grabbed him, pushed him backward, and then shoved him into his car; it will ignore his assertion of being choked.  See Mitchell, 472 U.S. at 526 ("Even if the plaintiff's complaint adequately alleges the commission of acts

that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts."); <u>LaCross</u>, 2012 WL 1694611, at *8-9 (disregarding plaintiff's version of events at summary judgment in excessive-force case when it conflicted with officers' testimony and documents in the record).[9]

## II.    Qualified immunity

Having determined what facts to consider in its analysis, the Court proceeds to address Count I, the excessive-force claim, for which Glazier argues that he is entitled to qualified immunity.  Qualified immunity protects state actors unless they have "violate[d] clearly established . . . constitutional rights of which a reasonable person would have known." <u>Mitchell</u>, 472 U.S. at 524.  In analyzing whether Glazier is entitled to immunity here, the Court must conduct a two-part inquiry:  do facts show that the challenged conduct violated a constitutional right?  If so, was the constitutional right at issue clearly established on the date in question?  <u>E.g.</u>, <u>Avalos v. City of Glenwood</u>, 382 F.3d 792, 798 (8th Cir. 2004) (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)).[10]

It is undisputed, on the date in question, that the Fourth Amendment precluded the use of excessive force by law-enforcement officers.  <u>E.g.</u>, <u>Andrews v. Fuoss</u>, 417 F.3d 813, 818 (8th Cir. 2005).  The question to be answered, therefore, is whether the force

---

[9] Because the Court disregards Bishop's contention that Glazier "choked" him, it is unnecessary to reach his assertion, raised for the first time at oral argument, that cases involving choking should be analyzed differently than those involving other types of force.

[10] The Court may decide which of these two questions to answer first.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 235-36 (2009).

used by Glazier exceeded the quantum constitutionally permissible.  As with all Fourth

Amendment claims, the answer turns on the "objective reasonableness" of Glazier's

conduct.  Graham v. Connor, 490 U.S. 386, 392 (1989); Samuelson v. City of New Ulm,

455 F.3d 871, 875 (8th Cir. 2006).  Under that standard, the Court must evaluate all of the

facts and circumstances surrounding the use of force, "careful[ly] balancing . . . the

nature and quality of the intrusion on [Bishop's] Fourth Amendment interests against the

countervailing governmental interests at stake."  Copeland v. Locke, 613 F.3d 875, 881

(8th Cir. 2010) (citations omitted).  This is an objective inquiry, "without regard to

[Glazier's] underlying intent or motivation."  Samuelson, 455 F.3d at 875-76 (citation

omitted).

        The Court concludes that the amount of force employed here was not

constitutionally excessive.  The record establishes that when Bishop told Glazier he

wanted to "go talk to" the Albert Lea officers, Glazier said "no, no, you're not going to

go talk to those officers," essentially ordering him to remain in his vehicle.  (Bishop Dep.

at 99-100.)  As acknowledged by Bishop's counsel at oral argument, Minnesota Statutes

§ 169.02 empowered Glazier to give such a command as part of his authority to "direct,

control, or regulate traffic."[11]  Bishop nevertheless violated that directive by exiting his

car.  Glazier, therefore, was permitted to use some quantum of force to enforce his order.

See, e.g., Wertish v. Krueger, 433 F.3d 1062, 1066-67 (8th Cir. 2006) (officer could

forcibly remove plaintiff from car when he refused command to exit); Foster v. Metro.

---

[11] Moreover, such an order was appropriate to ensure Bishop's safety, given the blinding snow
and passing vehicles nearby.

Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir.1990) (same); Farkarlun v. Hanning, __

F. Supp. 2d __, 2012 WL 684027, at *20 (D. Minn. Mar. 2, 2012) (Montgomery, J.)

("There is nothing repugnant to the Constitution about using force to ensure compliance

with lawful orders."); Kain v. City of Eden Prairie, Civ. No. 10-1740, 2011 WL 797455,

at *8 (D. Minn. Feb. 28, 2011) (Kyle, J.) ("[R]efusal to comply with an officer's orders,

when given an opportunity to do so, makes the officer's use of force more reasonable.")

(citation omitted).  Further, under the facts here, the amount of force Glazier used –

grabbing Bishop (even by the throat), pushing him backward into the car, and then

forcing him into the driver's seat – was not constitutionally excessive.  See, e.g., Wertish,

433 F.3d at 1066 (yanking plaintiff from car and taking him to the ground was not

excessive force when plaintiff failed to comply with officer commands to exit vehicle);

Andrews, 417 F.3d at 818 (no excessive force from "forceful blow" to plaintiff's

shoulder that pushed her backward several feet and made her "see stars," when she was

approaching person in courtroom despite admonition not to do so); see also Curd v. City

Court of Judsonia, Ark., 141 F.3d 839, 841 (8th Cir. 1998) (noting that grabbing plaintiff

forcefully by arm and turning her body was only a "limited amount of force").  Notably,

Bishop's counsel acknowledged at oral argument that Glazier was constitutionally

permitted to use force to shove Bishop back into his car.

Bishop argues that Glazier never expressly ordered him to remain in his vehicle,

asserting that "while sitting in the car, [he] did not ask whether he could exit his vehicle

or whether he had permission to walk over to the Albert Lea police officers," but rather

"asked . . . whether Deputy Glazier could get one of the other officers for him."  (Mem.

in Opp'n at 15 (emphases in original).)  That assertion is flatly contradicted by Bishop's

deposition testimony:

> Q:  And at some point you had asked about *going and talking* to the other
> officers, *but he told you, no, stay in your vehicle, correct*?
>
> A:  I did ask him if I could *go talk to another officer, those officers*, due to
> the way he was handling the situation.
>
> Q:  And he said no?
>
> A:  *Right, he said no.*

(Bishop Dep. at 99 (emphases added).)

> Q:  And then [Glazier] refused to let you *go get another officer*, correct?
>
> A:  Right, he refused to *let me get [one].*

(Id. at 109 (emphases added).)

> Q:  So he had given you one – he had responded to one request by saying
> no, you can't *go get another officer*?
>
> A:  It was probably multiple requests, but the same thing, yeah.
>
> Q:  And he had refused at least once to let you *go get another officer*?
>
> A:  Right.

(Id. at 112 (emphases added); see also id. at 122 ("[H]e wouldn't let me *go see* the

officer.") (emphasis added).)  Bishop cannot create a genuine issue of material fact by

contradicting his own deposition testimony at summary judgment.  See, e.g., Frevert v.

Ford Motor Co., 614 F.3d 466, 474 (8th Cir. 2010).  Moreover, despite his protestations

to the contrary, it cannot seriously be disputed that Bishop *understood* he was to remain

in his vehicle.  (See Bishop Dep. at 100 ("Q:  Was it your understanding that he wanted

you to stay in your vehicle?  A:  No, it was my understanding that he didn't want me to go talk to those officers.  *But in a way, yes, he wants me to stay in my vehicle for –*") (emphasis added); <u>see also</u> <u>id.</u> at 122 ("Q:  And in order to go see the officer you would have to get out of your vehicle, right?  A:  Right.").)  Indeed, this is very likely why he raised his hands as he exited his vehicle.[12]

In the Court's view, Bishop is using semantics to avoid summary judgment, claiming that "being told he could not go speak to [an]other officer" is somehow different than "being told he could not get out of the car."  (Reply Mem. at 4 (calling this "a distinction without a difference").)  But even if Bishop were correct that Glazier did not expressly and clearly order him to remain in his vehicle, under the facts here, it was reasonable for him to *believe* he had given such an order.  Qualified immunity, however, "protects all but the plainly incompetent or those who knowingly violate the law," not those who make "bad guesses in gray areas."  <u>Moore v. City of Desloge, Mo.</u>, 647 F.3d 841, 846 (8th Cir. 2011) (internal quotation marks and citations omitted).  Hence, even if Glazier had not been explicit in his command to Bishop, it would have been reasonable for him to believe he had given an unambiguous order and, therefore, use some measure of physical coercion to enforce it.  Accordingly, he would be entitled to qualified

---

[12] To be sure, Bishop's deposition testimony was not a model of clarity.  Yet, his sometimes inconsistent answers cannot create a *genuine* issue of material fact, when he repeatedly testified that Glazier told him he could not "go get" another officer.  <u>See, e.g.</u>, <u>Scott</u>, 550 U.S. at 380 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (alteration and emphases in original) (citation omitted); <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000) (noting that "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," and a plaintiff cannot avoid dismissal by creating a "weak issue of fact").

immunity in any event.  See, e.g., Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)

(immunity turns on objective reasonableness of conduct, not official's intent or

motivation).

**III.     The remaining claims**

In light of the foregoing, Count I of the Amended Complaint must be dismissed.

Moreover, the Court's subject-matter jurisdiction in this action was premised on the

existence of a federal claim.  (See Am. Compl. ¶ 3.)  Jurisdiction over the state-law

claims – which are the only claims remaining with Count I dismissed – was invoked

solely pursuant to the supplemental-jurisdiction statute, 28 U.S.C. § 1367, which provides

jurisdiction over state-law claims forming part of the same "case or controversy" as

federal claims.  But where all federal claims are dismissed prior to trial, the balance of

factors to be considered in deciding whether to exercise supplemental jurisdiction over a

pendent state-law claim typically militates against exercising such jurisdiction.  E.g.,

Johnson v. City of Shorewood, Minn., 360 F.3d 810, 819 (8th Cir. 2004) (citing

Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).  That is the case here.

Accordingly, the Court declines to exercise supplemental jurisdiction over Bishop's

claims for assault (Count III), battery (Count IV), and false imprisonment (Count VIII),

which will be dismissed without prejudice.[13]

---

[13] It is possible that complete diversity exists in this case.  The Amended Complaint alleges that
Bishop and Leasure are Oklahoma residents; Glazier, presumably, is a citizen of Minnesota; and
Freeborn County is a citizen of this state.  See, e.g., Moor v. Alameda Cnty., 411 U.S. 693, 718
(1973) ("[F]or purposes of diversity of citizenship, political subdivisions are citizens of their
respective States.") (citation omitted).  But the Amended Complaint does not allege sufficient
facts to determine whether diversity actually exists in this action, as it says nothing about

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Glazier's Motion for Summary Judgment (Doc. No. 26) is **GRANTED IN PART**.  The Motion is **GRANTED** as to Count I of the Amended Complaint, and that claim is **DIMMISSED WITH PREJUDICE**.  Counts III, IV, and VIII of the Amended Complaint are **DISMISSED WITHOUT PREJUDICE**.[14]

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  June 15, 2012                              s/Richard H. Kyle
                                                  RICHARD H. KYLE
                                                  United States District Judge

---

Glazier's citizenship and alleges only that Bishop and Leasure are Oklahoma *residents*.  See, e.g., Sanders v. Clemco Indus., 823 F.2d 214, 216 (8th Cir. 1987) (district court lacked diversity jurisdiction where complaint alleged only residency of plaintiffs, since citizenship is determined by domicile, not residence).  Moreover, neither the Complaint not the Amended Complaint invoked diversity jurisdiction.  See Fed. R. Civ. P. 8(a)(1) (pleading must contain "a short and plain statement of the grounds for the court's jurisdiction").  Under these circumstances, the Court need not analyze whether there exists independent diversity jurisdiction over Bishop's state-law claims.  See, e.g., Franklin v. Zain, 152 F.3d 783, 786 n.2 (8th Cir. 1998) (district court did not err in declining to exercise supplemental jurisdiction over state-law claims even though parties may have been diverse).

[14] See 28 U.S.C. § 1367(d).